# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARVEY CURTIS BAKER,<br><br>   Plaintiff,<br><br> v.<br><br>S. MOORE,<br><br>   Defendant. | Case No.  1:12-cv-00126-LJO-SAB<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 88, 99, 105) |

Currently before the Court is Defendant S. Moore's ("Defendant") motion for summary judgment with regard to Plaintiff Harvey Curtis Baker's ("Plaintiff" or "Baker") claim for failure to protect in violation of the Eighth Amendment.  (ECF No. 88.)

Plaintiff is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

## I.

## PROCEDURAL HISTORY

On December 26, 2013, Plaintiff filed a First Amended Complaint.  (ECF No. 68.)  On August 31, 2015, Defendant filed a motion for summary judgment.  (ECF No. 88.)  Pursuant to court order, Plaintiff filed an opposition on November 19, 2015. (ECF No. 99.)  Defendant filed a reply on January 25, 2016. (ECF No. 105.)

On October 23, 2015, Plaintiff filed a motion to compel discovery response.  (ECF No. 95.) On November 12, 2015, Defendant filed an opposition to Plaintiff's motion to compel. (ECF No. 98.) Plaintiff filed a reply on November 24, 2015.  On March 1, 2016, the Court

1

granted in part Plaintiff's motion to compel.  (ECF No. 107.)  The Court ordered Defendant to provide Plaintiff with a copy of all of the Part B pages of PSRS between July 16, 2009 and March 19, 2010, which describe the program governing the Fresno Bulldogs as a result of the July 16, 2009 triggering event.  The Court permitted Plaintiff to file an amended opposition to Defendant's motion for summary judgment by April 4, 2016.  However, Plaintiff has not filed an amended opposition.

## II.

## SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

A defendant does not bear the burden of proof at trial and in moving for summary judgment; he or she needs only prove an absence of evidence to support a plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v.

City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### III.
### DISCUSSION

#### A.  Summary of Plaintiff's Complaint

Plaintiff alleges that Defendant failed to protect him in violation of the Eighth Amendment. On March 19, 2010, Plaintiff was attacked by three Bulldog-affiliated inmates at the Correctional Treatment Center (CTC) at Pleasant Valley State Prison. When Defendant opened the sub-cell that was designated for Bulldog inmates, the three Bulldog inmates in that sub-cell rushed by her and started attacking Plaintiff, who was in an adjacent cell. Plaintiff alleges that B-Yard at PVSP was on a lockdown or modified program for 2 years prior to the incident in this case and that prison and escort staff working in the correctional treatment center knew about the Bulldog prisoners assaulting white prisoners on B-yard.

#### B.  Statement of Undisputed Facts

1.  Plaintiff was incarcerated at Pleasant Valley State Prison during the time period relevant to this lawsuit. (First Am. Compl., generally.)

2.  In March 2010, Defendant Officer Moore worked at PVSP in the Correctional Treatment Center (CTC) as an Entry Officer. As an Entry Officer in the CTC, Officer Moore was responsible for controlling the door to permit escorted inmates to enter the CTC for ducated medical appointments. (Moore Decl. at ¶¶ 1-2.)

3.  In March 2010, Officer Moore worked in the CTC with Officer Estrada, who was one of the Search and Escort (S&E) Officers, and Officer Martinez, who was one of the Health

1  Care Access Complex Escort Officers. (Moore Decl. at ¶ 3; Estrada Decl. at ¶ 1; Martinez Decl.
2  at ¶1.)
3      4.   On March 19, 2010, Officer Estrada and Officer Moore traded positions. Officer
4  Estrada worked at the entry desk, while Officer Moore was responsible for handling in-CTC
5  escorts with Officer Martinez. (Moore Decl. at ¶ 4; Estrada Decl. at ¶ 4.)
6      5.   On March 19, 2010, Baker was escorted to the CTC for a surgery appointment.
7  Upon arrival at the CTC, inmate Baker was placed inside a "B-yard holding tank," which
8  consisted of a main cell and three small adjacent cells (sub-cells) attached to the main cell.
9  (Moore Decl. at ¶ 5; Estrada Decl. at ¶ 5.)
10     6.   Inmate Marta came out of the sub-cell and started immediately assaulting Baker.
11 As Officer Moore tried to lock the sub-cell door, inmate Sanchez (G-64331) and inmate
12 Thompson (G-55980) pushed the sub-cell door open and rushed out and also began to assault
13 inmate Baker. (Moore Decl. at ¶ 7; Martinez Decl. at ¶ 5.)[1]
14     7.   Officer Moore immediately activated her alarm and yelled "get down," but the
15 inmates did not comply. (Moore Decl. at ¶ 8.)[2]
16     8.   Officer Moore was pushed against the wall and fell. Officer Martinez was very

---

[1] Plaintiff argues that Moore never tried to block any door and that she did not take any action other than yelling "Bulldogs." Defendant argues that Plaintiff testified at his deposition that he had "no idea" what Defendant did after Marta exited the sub-cell. (Pl.'s Dep. 48:7-49:13.) Defendant correctly points out that if Plaintiff had no idea what Defendant did, he cannot now testify that she did not try to lock the sub-cell door. The sham affidavit rule arises when the declarant's declaration contradicts earlier deposition testimony. Nelson v. City of Davis, 571 F.3d 924, 927 (9th Cir. 2009); see Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991) (holding a court may discount a "sham" declaration that "flatly contradicts" prior deposition testimony, and has been provided for the sole purpose of creating a genuine issue of material fact.) The underlying rationale of the sham affidavit rule is that a party may not "manufacture a bogus dispute with himself to defeat summary judgment." Davis, 571 F.3d at 928 (emphasis in original). Plaintiff cannot defeat summary judgment by presenting a declaration that contradicts his prior deposition testimony. Radobenko v. Automated Equipment Corp., 520 F.2d 540, 544 (9th Cir. 1975).

[2] Plaintiff asserts that Defendant never activated her alarm to his knowledge. Defendant replies that Defendant's declaration that she immediately activated her alarm and yelled "get down" is consistent with her contemporaneous report. The Court does note that Plaintiff's declaration is qualified "to his knowledge." Plaintiff testified during his deposition that someone triggered the alarm and that after the alarm was set, he heard some "get downs." (Pl.'s Dep. 50:1-14.) Affidavits or declarations used in support of or opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Plaintiff has not presented any evidence regarding whether or not Defendant activated her alarm and his statement that Defendant did not activate her alarm is not based on personal knowledge.

...

1  concerned about inmate Marta attacking Officer Moore, so Officer Martinez used his
2  Monadnock Expandable Baton (MEB) on inmate Marta. (Martinez Decl. at ¶ 5.)

3      9.      No other correctional staff used a MEB. (Martinez Decl. at ¶ 5.)[3]

4      10.     As Officers Martinez and Moore tried to exit the sub-cell, responding staff,
5  including Officer Estrada, arrived and used Oleoresin Capsicum (OC) Pepper Spray, at which
6  time the inmates complied and proned-out. (Moore Decl. at ¶ 9; Estrada Decl. at ¶ 7.)

7      11.     Responding staff and Officer Moore were instructed by Sergeant Navarro to place
8  mechanical restraints on all affected inmates and escort them outside for decontamination.
9  (Moore Decl. at ¶ 10.)

10     12.     As of March 19, 2010, Officers Moore, Estrada, and Martinez were aware that
11  Bulldog inmates were on lockdown, and that the sub-cell at CTC held Bulldog inmates. (Moore
12  Decl. at ¶ 11; Estrada Decl. at ¶ 8; Martinez Decl. at ¶ 6.)

13     13.     Officers Moore, Estrada, and Martinez were not aware that Bulldog inmates in the
14  sub-cell would rush out and attack inmate Baker. (Moore Decl. at ¶ 12; Estrada Decl. at ¶ 8;
15  Martinez Decl. at ¶ 6.)

16     14.     At no time did inmate Baker give Officer Moore any indication that he was afraid
17  of attack by the Bulldog inmates. (Moore Decl. at ¶ 12.)[4]

18     15.     No words were exchanged between inmate Baker and the Bulldog inmates prior
19  to the attack. (Moore Decl. at ¶ 13.)

20     16.     There was no indication of hostility between the Bulldog inmates and inmate
21  Baker prior to their attack on inmate Baker. (Moore Decl. at ¶ 13; Estrada Decl. at ¶ 9; Martinez
22  Decl.
23  at ¶ 7.)

24     17.     As of March 19, 2010, Officers Moore, Estrada, and Martinez were not aware of

---

[3] Plaintiff disputes that Officer Martinez did not use his MEB on any other inmate and that Officer Martinez did not strike inmate Baker with his MEB. Plaintiff declares that he was struck more than once with a baton. Therefore, these statements are in dispute. However, Plaintiff does not argue that other correctional staff used a MEB.

[4] Although Plaintiff argues that facts about indications of an attack between the Bulldogs and Plaintiff on the date of the incident, whether words were exchanged, and any indication of hostility are irrelevant, these facts are relevant when the Court considers the circumstances of the attack and what information Defendant knew prior to the attack.

1 any order that Bulldog inmates in the CTC were to be placed in restraints to go from the waiting 2 cells to appointments in the CTC. (Moore Decl. at ¶ 14; Estrada Decl. at ¶ 10; Martinez Decl. at 3 ¶ 8.)

4      18.   In 2010, Program Status Reports (PSR) were not posted in the CTC, or given to 5 CTC Correctional Staff. (Moore Decl. at ¶¶ 15-16; Estrada Decl. at ¶¶ 11-12; Martinez Decl. at 6 ¶¶ 9-10; Hosman Decl. at ¶¶ 4-5.)

7      19.   As of March 19, 2010, Officers Moore, Estrada, and Martinez, and Sergeant 8 Hosman, were not aware of any PSR that Bulldogs must be in restraints during escort in the 9 CTC. (Moore Decl. at ¶ 16; Estrada Decl. at ¶ 12; Martinez Decl. at ¶ 10; Hosman Decl. at ¶ 6.)

10      20.   Correctional Lieutenant Webster prepared a Clarification of Report for 11 Crime/Incident Report PartC1- Supplement (CDCR 837-C1) regarding Incident Report log no. 12 PVSP- HCU-10-03-0101, which involved the March 19, 2010 incident regarding Bulldog 13 inmates attacking inmate Baker. (Webster Decl. at ¶ 3.)

14      21.   Lieutenant Webster also reviewed the Institution Head Review of Use of Force 15 Critique and Qualitative Evaluation Analysis prepared on behalf of Warden Yates by Acting 16 Warden Trimble. This Use of Force Review indicated that the Correctional Staff involved used 17 appropriate force for the circumstances, in compliance with Departmental standards and policy, 18 and that no further action or policy/procedure review were warranted. (Webster Decl. at ¶ 4.)

19      22.   Lieutenant Webster's Clarification of Report inquired why the Bulldog inmates 20 were unrestrained when being escorted out of the holding cell at the Central Health Building, 21 which is where the Correctional Treatment Facility (CTC) is located. (Webster Decl. at ¶ 5.)

22      23.   Lieutenant Webster's Clarification of Report stated that in preparing the 23 Clarification of Report, his review of the Program Status Reports dated prior to the March 19, 24 2010 incident identified Bulldog-affiliated inmates as being on Lockdown status, however, they 25 did not indicate that the Bulldog-affiliated inmates were to be handcuffed when exiting their 26 cells. Lieutenant Webster found that Correctional Staff believed that as long as the inmates were 27 escorted they were working within the guidelines of the Lockdown status. Furthermore, 28 Lieutenant Webster found that as a result of the large number of inmates from Facility B being

treated at the Central Health Building/CTC, inmate Baker was kept in between the other two sub-cells in the CTC. Lieutenant Webster found that when Correctional Staff attempted to open the door, the Bulldog inmates forced their way past Staff and attacked inmate Baker. (Webster Decl. at ¶ 6.)

24. Correctional Captain D. Steele, who was the reviewer for Lieutenant Webster's Clarification of Report, approved it without need for further clarification on May 19, 2010. (Webster Decl. at ¶ 7.)

25. Dr. Conanan is the Chief Physician and Surgeon at Avenal State Prison, where Baker is currently housed, and Dr. Conanan has reviewed relevant portions of Baker's Unit Health Records (UHR) regarding the March 19, 2010 incident and Baker's medical complaints. (Conanan Decl. at ¶¶ 1-2.)[5]

26. On March 19, 2010, Baker sustained a cut above his left eye, which was closed with stitches. No other injury was noted in the Incident Report (CDCR Form 7219) or Baker's UHR. Baker's UHR states that he complained of no residual injuries from the March 19, 2010 incident until many months later. (Conanan Decl. at ¶ 3.)[6]

27. Several months after the March 19, 2010 incident, Baker was assaulted by two inmates on June 28, 2010. They punched Baker so hard that he lost two incisors. The Incident Report (CDCR Form 7219) for the June fight also showed abrasion on Baker's knees and elbows after the incident. (Conanan Decl. at ¶ 5.)

28. Baker's UHR shows that prior to the March 19, 2010 incident, he had complained of back and knee pain, and headaches. In addition, Baker had notified other CDCR medical care providers that he had been injured in motorcycle crashes prior to his incarceration. (Conanan

---

[5] Plaintiff does not dispute that Dr. Conanan reviewed his file. Plaintiff questions Dr. Conanan's assessment of Plaintiff's file and argues that he cannot be accountable for what medical staff documented. However, this undisputed fact does not mention Dr. Conanan's assessment of the file.

[6] Plaintiff does not dispute that he sustained a cut above his left eye, which was closed with stitches. Plaintiff argues that he suffered other injuries and that he is not accountable for what medical staff documented. This fact, however, details what was noted in the Incident Report and Plaintiff's UHR, which are not in dispute. The only dispute is over whether Plaintiff suffered any other injuries besides the ones noted in the Incident Report and Plaintiff's UHR.

Decl. at ¶ 4.)

29. Baker had pre-existing degenerative disc disease to his lower back, and he had been complaining of back pain for years prior to the March 19, 2010 incident, including a request for physician service submitted by Baker on September 20, 2010, stating that he nerve damage and back and leg chronic pain for over five years (Conanan Decl. at ¶ 6.)

30. An MRI was taken of Baker's right knee on July 11, 2011, which showed no abnormalities to Baker's right knee. (Conanan Decl. at ¶ 7.)[7]

31. Although Baker told his doctors that his back, knee, and other chronic pain was caused by being clubbed by officers during the March 19, 2010 incident, no physician has linked Baker's complaints of back, knee, or other chronic problems to the March 19, 2010 incident. (Conanan Decl. at ¶ 8.)

32. It is Dr. Conanan's professional medical opinion that Baker's complaints of back and knee pain, and other chronic pain, were not caused by the March 19, 2010 incident. (Conanan Decl. at ¶ 9.)[8]

### C. Plaintiff's Statement of Undisputed Facts

1. More than one baton blow was struck upon Baker.

2. The Bulldogs were hit with a baton.

3. By the time the pepper spray was employed, Baker had already been struck by the baton, and he reasonably infers that his attackers were being struck as well.

### D. Eighth Amendment- Failure to Protect

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (quotations omitted). Prison officials have a duty under

---

[7] Plaintiff did not dispute this part of Defendant's undisputed fact, and therefore, it is established as an undisputed fact for this motion for summary judgment.

[8] Although Plaintiff disputes this fact, Plaintiff does not challenge what Dr. Conanan's professional medical opinion was, and therefore what Dr. Conanan opined is undisputed for this motion for summary judgment.

8

1  the Eighth Amendment to protect prisoners from violence at the hands of other prisoners because
2  being violently assaulted in prison is simply not part of the penalty that criminal offenders pay
3  for their offenses against society.  Farmer, 511 U.S. at 833-34 (quotation marks omitted); Clem
4  v. Lomeli, 566 F.3d 1177, 1181 (9th Cir. 2009); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th
5  Cir. 2005).  However, prison officials are liable under the Eighth Amendment only if they
6  demonstrate deliberate indifference to conditions posing a substantial risk of serious harm to an
7  inmate; and it is well settled that deliberate indifference occurs when an official acted or failed to
8  act despite his knowledge of a substantial risk of serious harm.  Farmer, 511 U.S. at 834, 841
9  (quotations omitted); Clem, 566 F.3d at 1181; Hearns, 413 F.3d at 1040.

10       Where failure to protect is alleged, the defendant must knowingly fail to protect plaintiff
11  from a serious risk of conditions of confinement where defendant had reasonable opportunity to
12  intervene.  Orwat v. Maloney, 360 F.Supp.2d 146, 155 (D. Mass. 2005), citing Gaudreault v.
13  Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir. 1991); see also Borello v. Allison, 446
14  F.3d 742, 749 (7th Cir. 2006) (defendant's deliberate indifference must effectively condone the
15  attack by allowing it to happen); accord, Farmer, 511 U.S. at 833-834 (if deliberate indifference
16  by prison officials effectively condones the attack by allowing it to happen, those officials can be
17  held liable to the injured victim).  "Whether a prison official had the requisite knowledge of a
18  substantial risk is a question of fact subject to demonstrating in the usual ways, including
19  inference from circumstantial evidence, and a factfinder may conclude that a prison official knew
20  of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842.

21       It is well-established that the pleadings of pro se litigants are held to "less stringent
22  standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520
23  (1972) (per curiam).  Nevertheless, "[p]ro se litigants must follow the same rules of procedure
24  that govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), overruled on
25  another ground by Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc).  However,
26  the unrepresented prisoners' choice to proceed without counsel "is less than voluntary" and they
27  are subject to the "handicaps...detention necessarily imposes upon a litigant," such as "limited
28  access to legal materials" as well as "sources of proof."  Jacobsen v. Filler, 790 F.2d 1362, 1364-

1  65 & n.4 (9th Cir. 1986).  Inmate litigants, therefore, should not be held to a standard of "strict
2  literalness" with respect to the requirements of the summary judgment rule.  Id.  The court is
3  mindful of the Ninth Circuit's more overarching caution in this context, that district courts are to
4  "construe liberally motion papers and pleadings filed by pro se inmates and ... avoid applying
5  summary judgment rules strictly."  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

6  Defendant argues that she was not deliberately indifferent to Plaintiff because she
7  believed that Bulldogs were not required to be restrained in the CTC.  However, Plaintiff's
8  deliberate indifference argument is based upon Defendant's choice not to use restraints when
9  moving the Bulldog inmates and the general manner in which Defendant opened the door of the
10 Bulldog inmates' sub-cell.

11 On December 26, 2013, Plaintiff filed his First Amended Complaint against Defendant.
12 (ECF No. 68.)  In the January 8, 2014 order, the Court found that Plaintiff could proceed on the
13 claims in the First Amended Complaint that corresponded to the claims that the Court had found
14 cognizable in the April 9, 2013 screening order.  (ECF No. 69.)  In the April 9, 2013 screening
15 order, the Court found that Plaintiff stated a cognizable Eighth Amendment claim against Jane
16 Doe #1 (Defendant), because "Plaintiff alleged facts that plausibly support the conclusion that
17 Jane Doe #1 allowed the three Bulldog Prisoners to attack Plaintiff despite knowing that Plaintiff
18 faced a substantial risk of serious harm by allowing the Bulldog Prisoners to enter the main cell
19 area where Plaintiff was held without restraining them."

20 Plaintiff's First Amended Complaint does allege that inmates were being placed in
21 restraints before being escorted outside of any cell or holding tank and that Defendant opened the
22 door of the holding tank where the 3 Bulldog prisoners were temporarily housed without first
23 placing them in restraints.  (FAC at ¶¶ 17-20, 38-58.)  However, Plaintiff also alleges that
24 Defendant failed to follow CDCR policies and procedures related to prisoner safety during a
25 lockdown modified program situation and that Defendant should have been trained in all policies
26 related to the escorting and transferring of inmates during a lockdown modified program
27 situation.  (FAC at ¶¶ 36-58.)  Plaintiff argues in his opposition to Defendant's motion for
28 summary judgment that Defendant failed to follow procedures for opening a cell door of a cell

with three inmates in it. (ECF No. 99 at 10.) Therefore, Plaintiff alleges an Eighth Amendment violation based on Defendant's general failure to follow policies and procedures related to prisoner safety during a lockdown modified program situation when moving inmates, and specific failure to place the Bulldogs in restraints in the CTC.

Defendant argues that there were no circumstances in this matter to give rise to an inference of a substantial risk of attack. Defendant argues that Plaintiff did not give any indication that he was afraid of attack by Bulldog inmates. A prison official cannot escape liability by showing that "he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer, 511 U.S. at 843. Further, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Id. Therefore, although Defendant may not have been aware of an attack for reasons personal to Plaintiff, if prisoners in Plaintiff's situation faced such a risk, then Defendant may be liable for an Eighth Amendment claim.

The jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842. For example, if the "plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'" Id. at 842–43 (quoting respondents' brief). Liability for deliberate indifference may not be premised on constructive notice, but prison officials cannot ignore obvious dangers to inmates. See Farmer, 511 U.S. at 842.

Defendant argues that she, Officer Martinez, and Officer Estrada did not have any knowledge that Bulldogs would assault white inmates and that they were not aware of tensions between the two groups. However, Defendant declares (and it is undisputed) that she was aware

11

1  that Bulldog inmates were on lockdown.⁹ (Moore Decl. ¶ 11.) Defendant produced in discovery
2  PSR PVP-FBP-09-07-0248, Part B, dated July 16, 2009. (ECF No. 95 at 29.) Defendant argues
3  in her opposition to Plaintiff's motion to compel that "PSR Part B contains the orders for
4  Bulldog escorts from the triggering event to the day of the incident." (ECF No. 98 at 7.) Part B
5  of the PSRs show whether the program is normal, modified, lockdown, or state of emergency,
6  the area affected, the race of inmates affected, the reason for the program change, and
7  information about restrictions to movement, feeding, ducats, visiting, workers, showers, medical,
8  legal library, dayroom, recreation, canteen, packages, phone calls, and religious services.
9  The Court notes that PSR PVP-FBP-09-07-0248, Part B, dated July 16, 2009, states that the
10 lockdown on facility B was the result of a riot or disturbance and death and that the lockdown
11 affected all inmates. (ECF No. 95 at 29.) Further, the PSR states that only "Black/Others" can
12 work for critical workers and clerks, which are the only two groups of workers allowed to work.
13 (ECF No. 95 at 29.) The PSR says specifically "NO Whites, Hispanics" for workers. (ECF No.
14 95 at 29.) In K. Geringer's September 23, 2015 declaration, he stated that the riot that took place
15 on Facility B Recreation Yard on July 16, 2009, involved the "disruptive group Fresno Bulldogs
16 and other inmates." (ECF No. 95 at 67-68.)

Defendant argues that Plaintiff has not shown that there was a history of violence between the Bulldogs and white inmates, and that even if there was such history, this does not give rise to the inference of substantial risk in these circumstances. Defendant argues that the risk was more substantial in Estate of Torres v. Terhune, No. civ-S982211-WBS-GGH, 2002 WL 32107989, at *1 (E.D. Cal. Jan. 9, 2002) and Stephenson v. Martel, No. 2:10-CV-0238 AC P, 2013 WL 1499420 at *1 (E.D. Cal. Apr. 11, 2013), but that the courts in those cases found that the inference of a substantial risk of attack was lacking. Cases require a plaintiff to show more than "a generalized concern for his safety and welfare." Blacker v. Satterthwaite, No. 1:08-cv-874, 2011 WL 6338851, at *6 (S.D. Ohio Oct. 14, 2011).

In Plaintiff's First Amended Complaint, he alleges that B-Yard at PVSP was on a

---

⁹ Based on the declarations and information before the Court, it appears that the Bulldogs were technically on a modified program, and not a lockdown. However, the Court uses the term "lockdown," because that is the term that Defendant used in her declaration.

1  lockdown or modified program for 2 years prior to the incident in this case. (FAC at ¶ 6.) He
2  alleges that Bulldog prisoners were to be segregated from all white prisoners at all times during
3  the lockdown. (FAC at ¶ 10.) Plaintiff alleges that "[i]t was well known to all prison staff that
4  all Bulldog prisoners on B-yard were assaulting any and all white un-affiliated prisoners 'on-
5  sight' (meaning at any opportunity they got)." (FAC at ¶ 8.) Further, he alleges that "[i]t was
6  well known by prison staff that there were several incidents of Bulldog prisoners assaulting
7  white prisoners 'on-sight' and in a wholly unprovoked manner while on the lock-down modified
8  program on B-yard." (FAC at ¶ 9.) Specifically, he alleges that "[i]t was well known by prison
9  and escort staff working in the correctional treatment center about the assaults taking place from
10 the Bulldog prisoners toward any and all white prisoners on B-yard for the past 2 years." (FAC
11 at ¶ 12.) Defendant had the opportunity to present evidence contradicting Plaintiff's allegations
12 and arguments regarding the lockdown, why the Bulldogs were still on lockdown, and what
13 information was known by prison staff, including PSR parts A and C for the lockdown.
14 Defendant has not refuted Plaintiff's allegations regarding the lockdown and what information
15 was known by prison staff about the lockdown.

16      In Estate of Torres, there was an incident between two gangs and the plaintiffs argued
17 that the defendants had knowledge that the two gangs had a history of violence which included
18 an incident in August 1996 and an incident in November 1997 that led to a lockdown. Estate of
19 Torres, 2002 WL 32107989, at *8. During the lockdown, prison officials supervised meetings
20 among inmates from the two groups over a two-week period during which the inmates said that
21 there would be no problems between the two groups. Id. On summary judgment, the district
22 judge found that there was no evidence that the defendants "knew of and disregard[ed] an
23 excessive risk to inmate health or safety" when they designed and implemented the yard release
24 that happened on the day of the incident. Id. (citing Farmer, 511 U.S. at 837). Further, the
25 district court found that "plaintiffs' evidence is devoid of any facts suggesting that defendants
26 predicted or encouraged violent altercations among inmates." Estate of Torres, 2002 WL
27 32107989, at *9.

28      In Stephenson, the court granted summary judgment sua sponte in defendants' favor

1 because plaintiff's proposed evidence was insufficient as a matter of law to support an inference
2 of knowledge of the risk of serious harm.  Stephenson, 2013 WL 1499420, at *10.  In that case,
3 the plaintiff was a Level III Special Needs Yard inmate who was attacked on the exercise yard
4 without warning by a level IV inmate.  The plaintiff argued that defendants knew or should have
5 known that the level IV inmate who attacked plaintiff was violent and that they disregarded that
6 information when they allowed him to commingle with Level III inmates.  Id. at 8.  The district
7 court found that the defendants did not know of any specific or general threat to plaintiff by the
8 inmate who attacked him.  Id. at 9.  The plaintiff also argued that "defendants knew or should
9 have known more generally that commingling Level III inmates with Level IV inmates would
10 result in an excessive risk to plaintiff's safety."  Id.  The court found that except for inadmissible
11 assertions, plaintiff's proffered evidence was not relevant to the question of whether a
12 sufficiently unsafe condition objectively existed.  Id. at 10.  The court held that "the mere fact
13 that inmates of different classifications are allowed to commingle does not constitute proof of
14 objectively dangerous conditions that would pose a substantial risk of serious harm."  Id.

15      As stated above, Defendant was aware that the Bulldogs were on lockdown.  (Moore
16 Decl. ¶ 11.)  The lockdown situation in the present case is distinguishable from Estate of Torres
17 and Stephenson, where there was only a history of violence between the group that the attackers
18 belonged to and the group that the plaintiff belonged to.  In Estate of Torres, prior to the incident,
19 the two gangs had meetings supervised by prison officials and assured prison officials that there
20 would not be any problems between the two groups.  Prison officials then decided to begin
21 commingling the two gangs again.  Here, there was not merely a history of violence between
22 Bulldogs and non-Bulldog inmates in the past, but there was an ongoing lockdown involving
23 Bulldogs at the time of the incident.

24      In this case, there is a genuine dispute regarding whether Defendant knew of the
25 underlying facts indicating sufficiently substantial danger or that she knew the underlying facts
26 but believed that the risk to which the facts gave rise was insubstantial or nonexistent.  It is
27 undisputed that Defendant was aware that the Bulldogs were on lockdown, but Defendant has
28 not offered evidence regarding what she specifically knew about the lockdown.

Defendant argues that she is entitled to summary judgment because she "responded reasonably to the risk, even [though] the harm ultimately was not averted. See Farmer, 511 U.S. at 844. "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer, 511 U.S. at 845. Defendant argues that she responded reasonably, because she was pushed and knocked down by the Bulldog inmates, and she managed to activate her alarm. Defendant asserts that she did not stand idly by, and allow Plaintiff to be assaulted. The relevant question is whether Defendant responded reasonably to the substantial risk to inmate health or safety. Defendant must show that she took reasonable measures to guarantee the Plaintiff's safety in regards to the risk. The Court finds that it is not clear whether the Defendant activating her alarm when the Bulldogs were already outside of the sub-cell and attacking or about to attack Plaintiff is a reasonable response to the risk that the Bulldogs would attack Plaintiff. There is a factual dispute about how Defendant opened the sub-cell door and whether she should have opened the door differently. A jury could infer that the manner in which Defendant opened the cell door could have resulted in the Bulldog inmates rushing out of the cell and Plaintiff, as a non-Bulldog white inmate, might have been in danger from Bulldogs being let out of their cell and into the cell that he was in. Therefore, it is unclear at this time whether Defendant responded reasonably to the risk.

Defendant argues that she cannot be held liable for the alleged excessive force used by other officers who are not parties to this lawsuit. In his amended complaint, Plaintiff alleges that he received substantial injury to his head, face, chest, arms, hands, and lower back because of the attack by the Bulldog inmates. (ECF No. 68 at 4.) Plaintiff also alleges that his injuries from the Bulldog inmates were compounded by the excessive use of force used by the correctional officers. (ECF No. 68 at 4.) Plaintiff argues that he was kicked and beaten by the Bulldog inmates and that he suffered a cut that required stitches. Defendant admits that on March 19, 2010, Baker sustained a cut above his left eye, which was closed with stitches. (DUMF 26.) According to Defendant's alleged version of events, Plaintiff was not struck by an MEB. Therefore, according to Defendant's version of events, Plaintiff's injuries were caused by the Bulldog inmates during the attack. Accordingly, Plaintiff has alleged that he suffered injuries at

the hands of the Bulldog inmates as a result of them getting out of their sub-cell and into the main cell that he was temporarily housed in at the CTC.  Defendant has not presented evidence to establish that Plaintiff was not injured by the Bulldog inmates.

Based on the conflicting testimony presented by way of verified affidavits and deposition testimony, there is a genuine issue of material fact as to whether Defendant failed to protect Plaintiff from harm from the Bulldog inmates on March 19, 2010, because of the way she opened the Bulldogs' cell door in the CTC so that they were in the same cell as Plaintiff.  The Court cannot weigh the parties' conflicting evidence or make credibility determinations on summary judgment, see, e.g., George v. Edhom, 752 F.3d 1206, 1214 (9th Cir. 2013), and Plaintiff's evidence suffices to create a disputed issue of material fact as to whether Defendant knowingly disregarded a substantial risk of serious harm.  Summary judgment in Defendant's favor should be denied.

### E.     Qualified Immunity

Finally, Defendant argues that she is entitled to qualified immunity.  The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine if an official is entitled to qualified immunity the court uses a two part inquiry.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The court determines if the facts as alleged state a violation of a constitutional right and if the right is clearly established so that a reasonable official would have known that his conduct was unlawful.  Saucier, 533 U.S. at 200.

The district court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson, 555 U.S. at 236.  The inquiry as to whether the right was clearly established is "solely a question of law for the judge."  Dunn v. Castro, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't. 556 F.3d 1075, 1085 (9th Cir. 2009)).  In deciding whether officials are entitled to qualified

immunity, the court is to view the evidence in the light most favorable to the plaintiff and resolve all material disputes in the favor of the plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

"The constitutional right at issue in this case is the right to be free from violence at the hands of other inmates," Castro v. Cnty. Of Los Angeles, 785 F.3d 336, 344 (9th Cir. 2015), and the fact must be viewed in the light most favorable to Plaintiff, Chappell v. Mandeville, 706 F.3d 1052, 1057 (9th Cir. 2013). This case involves violence by Bulldog gang members against a white inmate in the CTC holding cell when the Bulldog gang members went out of their sub-cell and into the cell holding the white inmate. Plaintiff alleges that Defendant knowingly disregarded a serious risk of harm when she opened the Bulldogs' sub-cell door and the Bulldogs were able to get to the cell where Plaintiff was located.

Defendant argues that she is entitled to qualified immunity because she did not violate Plaintiff's rights. However, as discussed above, Plaintiff has raised a genuine issue of material fact as to whether Defendant acted with deliberate indifference. Given the disputes as to what knowledge Defendant had about the lockdown, how Defendant should have opened the sub-cell door, and how Defendant actually did open the sub-cell door, the Court cannot find as a matter of law that it would have been unclear to Defendant that her conduct was unlawful. Plaintiff's evidence regarding the events in question, accepted as true at this juncture, is sufficient to allow a reasonable jury to conclude that Defendant knowingly disregarded an objectively serious risk of harm to Plaintiff's safety, in violation of the Eighth Amendment. Foster v. Runnels, 554 F.3d 807, 815 (9th Cir. 2009).

Regarding the second step of the inquiry, "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he/she is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful." Hope, 536 U.S. at 739. "Specificity only requires that the unlawfulness be apparent under preexisting law," Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted),

and prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances," Hope, 536 U.S. at 741.

Here, the duty to protect inmates form harm at the hands of other inmates had long been established by 2010, and a reasonable officer would understand that allowing Bulldog inmates into a cell with a non-Bulldog inmate during the lockdown violates the non-Bulldog inmate's rights. The Court reiterates that to the extent Plaintiff's version of events lack credibility and/or is undermined by some of the facts presented, that evaluation must be made by the jury. See, e.g., Cortez v. Skol, 776 F.3d 1046, 1053 (9th Cir. 2015); Bravo v. City of Santa Maria, 665 F.3d 1076, 1083 (9th Cir. 2011).

Accordingly, the Court finds that Defendant is not entitled to qualified immunity.

## IV.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that Defendant's motion for summary judgment be DENIED, and this action be set for trial.

Although Plaintiff has changed his address to his home address, it appears that Plaintiff is still incarcerated. The Clerk's Office is DIRECTED to serve a copy of this Findings and Recommendations on Plaintiff at both the address listed on the record and the following address:

> Harvey Curtis Baker
> CDCR # G62938
> Valley State Prison
> P.O. Box 96
> Chowchilla, CA 93610-0096

This Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with this Findings and Recommendation, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to objections may be filed within **fourteen (14) days** of the date of service of any objections. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are

//

advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  __**August 1, 2016**__

UNITED STATES MAGISTRATE JUDGE